# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | David H. Coar | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 03 C 3891 | **DATE** | 8/02/2004 |
| **CASE TITLE** | James Mangrum et al. vs. Morrison Timing Screw Company | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

> Defendant's Motion for Summary Judgment [Doc. No. 23]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ☒ [Other docket entry] For the reasons set forth in the attached memorandum opinion and order, Defendant's Motion for Summary Judgment [Doc. No. 23] is DENIED.

(11) ☒ [For further detail see order attached to the original minute order.]

| | | |
|---|---|---|
| | No notices required, advised in open court. | **Document Number** |
| | No notices required. | number of notices |
| | Notices mailed by judge's staff. | |
| | Notified counsel by telephone. | AUG - 3 2004 |
| X | Docketing to mail notices. | date docketed |
| | Mail AO 450 form. | **40** |
| | Copy to judge/magistrate judge. | docketing deputy initials: 15 |
| s lf (lc) | courtroom deputy's initials | |

CLERK, U.S. DISTRICT COURT

2004 AUG -2 PM 5:26

Date/time received in central Clerk's Office

date mailed notice

mailing deputy initials

DOCKETED

AUG ‑ 3 2004

JAMES MANGRUM, PAUL STEINWEG,   )
JAMES GUHL, and FRANK THIBIDEAU   )
   )
      Plaintiffs,   )
   )
   )   No. 03 C 3891
     v.   )
   )   HONORABLE DAVID H. COAR
MORRISON TIMING SCREW COMPANY,   )
   )
      Defendant.   )

## MEMORANDUM OPINION AND ORDER

Before this Court is Defendant Morrison Timing Screw Company's motion for summary

judgment on Plaintiffs' Complaint, which alleges unlawful employment discrimination in

violation of 29 U.S.C. § 623 of the Age Discrimination in Employment Act ("ADEA"). For the

reasons set forth below, Defendant's motion for summary judgment is DENIED

## I. SUMMARY JUDGMENT STANDARD

Summary judgment is proper when the "pleadings, depositions, answers to

interrogatories, and admissions on file, together with affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party is entitled to judgment as a matter

of law." Fed. R. Civ. P. 56. All inferences must be drawn in the light most favorable to the

nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). Thus, the Court

accepts the nonmoving party's version of any disputed facts; however, those facts must be

40

supported by relevant, admissible evidence. <u>Bombard v. Fort Wayne Newspapers, Inc.</u>, 92 F.3d 560, 562 (7th Cir. 1996).

It is the burden of the party moving for summary judgment to demonstrate the absence of genuine issues of material fact for trial. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986); <u>Hedberg v. Indiana Bell Tel. Co., Inc.</u>, 47 F.3d 928, 931 (7th Cir. 1995). If the moving party meets this burden, the non-moving party must set forth specific facts that demonstrate the existence of a genuine triable issue. Rule 56(e); <u>Celotex</u>, 477 U.S. at 324. To successfully oppose the motion for summary judgment, the non-moving party cannot rest on the pleadings alone, but instead must designate specific facts in affidavits, depositions, answers to interrogatories or admissions that establish that a genuine triable issue exists. <u>Selan v. Kiley</u>, 969 F.2d 560, 564 (7th Cir. 1992). A mere scintilla of evidence in opposition to a motion for summary judgment is insufficient. <u>Anderson</u>, 477 U.S. at 252.

## II. FACTS[1]

### A. Company Overview

Defendant Morrison Timing Screw Company ("Defendant" or "Morrison") is an Illinois corporation engaged in the business of designing and manufacturing change parts, timing screw kits, and custom machinery, which are all used in conjunction with a packaging production line. The employees of Morrison's production department are assigned job duties based on their skill sets and experiences. The various duties within Morrison's Production Department include

---

[1] Unless otherwise noted, the following undisputed facts are taken from the Parties' Local Rule 56.1 materials.

Journeyman machinists, lathe and mill operator, field service, computer drafting, cutting timing screws, timing screw assembly, timing screw set-up and filming, lathe operator, machine assembly, kit assembly, Komo operator, blanking and timing screw assembly, estimator, machine maintenance, changing parts out, janitorial work, machine operator, CNC programmer, changer part assembly, inspection, timing screw hardware, mill operator, stockroom, timing screw machine operator, customer inquiries and welding for machine and kit assembly. Production employees have primary job responsibilities upon which the majority of their time at Morrison is spent. However, many production employees have the capacity to work in more than one area of the company, if necessary.

Morrison's management supervises the production department employees. Three of those management employees are often responsible for making Morrison's crucial business decisions. The first, Nick Wilson ("Wilson"), has served as President of Morrison since May 1, 1971. As President, Wilson's primary duties include general management, sales, manufacturing and service. The second management employee is Lois Hayworth, who has served as Morrison's Vice-President since the early 1990's. As Vice-President, Lois Hayworth: (1) oversees Morrison's administrative staff; (2) assists with insurance work, bookkeeping and month-end closings; (3) transfers funds to Morrison's 401(k) plan; (4) handles Morrison's payroll; (5) participates in hiring decisions; (6) evaluates, and occasionally disciplines, employees; and (7) purchases office equipment. Finally, Joe Hayworth is Morrison's Production Manager. As Production Manager, Hayworth: (1) supervises the Production Department employees; (2) overseas the operations of the production department; (3) directs the projects of the production employees; and (4) hires, evaluates and disciplines production employees.

In 2002, Morrison contends that it began to experience financial difficulties, particularly in the area of custom machinery. Wilson began to evaluate whether Morrison needed to shift its focus away from custom machinery. Custom machinery yielded a low profit margin, and there were no custom machinery orders in 2002. Based on these factors, Wilson determined that custom machinery would no longer be the long term focus of the business. Wilson approached Lois and Joe Hayworth to help him determine which employees would provide Morrison with the best opportunity to be able to stay in business, based on the particular skill sets they brought to the company. Morrison contends that in the course of these discussions, Joe Hayworth provided Nick Wilson and Lois Hayworth with information relating to the skills and work histories of Morrison's employees, including the four Plaintiffs. After these discussions, based on the company's poor financial condition, the low backlog, and the specific employee skills which would provide the best opportunity for Morrison to stay in business, in December 2002, Morrison decided to lay off the four Plaintiffs in this suit: (1) James Mangrum ("Mangrum"), age 58[2]; (2) Paul Steinweg ("Steinweg"), age 64; (3) James Guhl ("Guhl"), age 57; and (4) Frank Thibideau ("Thibideau"), age 59. In addition to the four Plaintiffs, Mangrum laid off: (1) Jacqueline Guhl, age 57 (the wife of Plaintiff James Guhl); and (2) Robert Buchner ("Buchner"), age 47. Each Plaintiffs' employment history at Morrison, in addition to Defendant's stated reason for deciding to lay off each Plaintiff, will be addressed in turn.

---

[2]All ages reference the employees' age at the time of discharge.

### 1. James Mangrum

Mangrum, age 58, was hired by Morrison in 1987, into the position of machine assembly. While working in machine assembly, Mangrum's job duties consisted of pulling parts for jobs and working with the engineering department to ultimately assemble machines according to in-house blueprints. In 1991 or 1992, Mangrum transferred to the inspection department. While working for the inspection department, Mangrum's employment duties consisted of checking the container handling and fit of timing screws and other container handling parts, including stars and guides and bottle clamps, to ensure they were made according to the customers' specifications. Mangrum worked in Morrison's inspection department until he was terminated on December 31, 2002. While working in inspection, Mangrum had a succession of supervisors, which included Andy Kemetz, Lloyd Vermelland, Tom Gora ("Gora"), Joe Hayworth, Lois Hayworth and Wilson. At the time of his lay off, Mangrum's supervisor was Lois Hayworth. Additionally, Mangrum would report to Joe Hayworth indirectly, as Joe Hayworth would often provide Mangrum with the shipping goals or schedule for a given day or week.

Morrison contends that it laid off Morrison because he produced a low quality of work.[3] Morrison contends that it also determined that it did not need two employees to perform inspection work. In addition, Wilson considered the fact that Mangrum was not dependable and would allow parts that failed to meet inspection criteria pass inspection. Further, Defendant contends that it considered that Mangrum failed to grow in certain areas of the company, and the

---

[3] The specific incidents that Morrison contends demonstrate Mangrum's low work quality will be discussed in Section III(B)(1) of this Opinion.

long period of time it took for him to enroll in an educational class that could potentially improve his employment skills. Finally, Morrison considered the communication problems Mangrum had with Joe Hayworth and others at the company.

### 2. Paul Steinweg

Steinweg, age 64, began his employment with Morrison in 1992, as a welder. Steinweg remained in the welder position throughout his employment with Morrison. As a welder, Steinweg's employment responsibilities consisted of doing all the necessary welding for Morrison. In addition to welding, Steinweg assembled machines, timing screw kits, timing screws, and stars and guides, wired some of Morrison's machines, and conducted building maintenance. Occasionally, Steinweg also operated Morrison's manual mills and lathes. In the past, Steinweg made service calls to customers when needed. Approximately two to three months prior to Steinweg's termination from Morrison, the work available in custom machinery decreased. Therefore, Steinweg also worked in timing screw kit assembly, and other areas as needed. Throughout his employment with Morrison, Steinweg reported to Joe Hayworth.

Morrison contends that it laid off Steinweg because there was a lack of welding work. According to Morrison, Steinweg lacked the necessary skills to transfer to another area of Morrison's Production Department. Additionally, Morrison contends, Steinweg did not posses the necessary skills to run the computer-controlled equipment used to make timing screws, timing screw kits and change parts. Finally, Morrison contends that the salaries of some of the remaining jobs were not commensurate with the salary that Steinweg earned in December 2002.

### 3. Frank Thibideau

Thibideau, age 59, was hired into an assembly position at Morrison in December 1987. For the first four to five years of Thibideau's employment with Morrison, his work consisted of the assembly of stars and guides. Thibideau then moved to the assembly of timing screw kits and testing relating to timing screw kits. Eventually, Thibideau moved to the assembly and testing relating to machines. Thibideau also performed building and machine maintenance, as well as various other projects, including the remodeling of a building, prototypes for screws, and work with light boxes.[4] While employed at Morrison, Thibideau's supervisors included: Andy Kemetz, Keith Register, Gora, and Joe Hayworth, who supervised Thibideau during his last eight years of employment with Morrison.

Morrison contends that it terminated Thibideau because there was a lack of machine assembly work, and he lacked the requisite skill set to move into other areas at the company. In particular, Morrison states that Thibideau did not possess computer-controlled operated skills or the experience in making and assembling timing screws that other people had.

### 4. James Guhl

Guhl, age 57, was hired by Morrison in 1990, into the position of welder. After working as a welder for approximately two years, Guhl moved to stars and guides assembly. After working in stars and guides for approximately two years, Guhl began to operate a Komo machine. According to Guhl, assembly was his primary job responsibility for the last six years of

---

[4] Thibideau also designed certain prototype machines for Morrison. Thibideau and Wilson have a patent on a light box that Thibideau worked to design. Additionally, when Morrison was preparing to move to its present location, Thibideau, practically singlehandedly, worked to repair and remodel the building, and install some of the electrical wiring, plumbing and heating systems that were required.

his employment with Morrison, but he would also perform other job duties as necessary to meet the production deadlines for custom orders and other products. While working in the welder and stars and guides assembly positions, Guhl reported to Gora. While running the Komo machine, Guhl reported to Keith Register, Tony Frye, and finally, Joe Hayworth, who Guhl reported to until his employment at Morrison ended.

Morrison states that it specifically selected Guhl for lay off because there was a lack of machine assembly work, and that Guhl lacked the necessary skills that other people who were already doing certain jobs or capable of doing certain jobs possessed. Specifically, Defendant notes, although Guhl was a Komo operator, he was third in line to perform that position. Additionally, Morrison contends, Guhl lacked the requisite skill set in the area of timing screws.

### C. The December 31, 2002 Meeting

On December 31, 2002, Lois Hayworth conducted a meeting with Joe Hayworth, the four Plaintiffs and Jackie Guhl.[5] Lois Hayworth informed the Plaintiffs and Jackie Guhl that due to the fact that the level of work was low, and had not picked up in other areas as Morrison thought it would, Defendant had to lay off the Plaintiffs and Guhl. Lois Hayworth stated that this decision, which was based on Morrison's financial state, would last for an indefinite amount of time, and Morrison was not sure how long it was going to last. Additionally, Mangrum inquired as to why the individuals in the meeting were chosen for the lay off. Lois Hayworth responded, "machine area was the lightest in backlog" and that "they had no backlog in." See Lois Hayworth Dep. Tr., p. 31. lines 21-24, p. 32, line 1. Later that same day, Lois Hayworth called

---

[5] During the course of this meeting, Plaintiff Guhl twice asked Lois Hayworth, jokingly, "if this was a meeting for old people." See Guhl Dep. Tr., p. 48, lines 23-24; p. 49, lines 1-5.

Robert Buchner into a meeting and informed him that Morrison did not have enough work for him, and therefore, had to lay him off.

### D. Events After December 31, 2002

After the layoffs, Plaintiffs' work duties were absorbed by other Morrison employees. In late January 2003, Morrison rehired Buchner, as the Defendant contends that its business needs for his engineering/drafting capabilities increased.[6] Morrison contends that it rehired Buchner on a temporary basis, and specifically told him not to stop looking for other employment because Morrison was not sure that work was going to continue and had no reason to believe the position would eventually become full-time. Morrison contends that from his rehire through June 2003, Buchner worked in engineering, but also assisted occasionally (but minimally) with welding work. Morrison contends that since June 2003, Buchner has worked in engineering, but has also assisted occasionally (but minimally) with welding work.

Subsequently, in 2003, Morrison hired seven new employees, and five employees terminated their employment with Morrison. Morrison contends that on March 26, 2004, Morrison laid off employee Kenneth Jellema, an engineer, age 49, in an effort to bring costs in line with sales. Additionally, in February 2004, Robert Panozzo ("Panozzo"), age 28., voluntarily terminated his employment with Morrison. Morrison has not replaced Panozzo.

---

[6] Prior to Buchner's 2002 layoff, he worked as an engineer and performed training, field service and welding work.

## III. ANALYSIS

### A. Proof of Discrimination Under the ADEA

The ADEA prohibits discrimination against individuals forty years and older, Taylor v. Canteen Corp., 69 F.3d 773, 778 (7th Cir. 1995) (citing 29 U.S.C. § 631(a)), "with respect to compensation, terms, conditions or privileges of employment." Taylor., 69 F.3d at 778 (citing 29 U.S.C. § 623(a)). Plaintiffs may prove employment discrimination under the ADEA using either the direct or indirect method of proof. Cerutti v. BASF Corporation, 349 F.3d 1055, 1060-61 (7th Cir. 2003) (citing Cianci v. Pettibone Corp., 152 F.3d 723, 727-28 (7th Cir. 1998)). Under the direct method of proof, Plaintiffs must present evidence that age was a dispositive factor in their discharge. Sarsha v. Sears, Roebuck & Co., 3 F.3d 1035, 1038 (7th Cir. 1993) (citing King v. General Electric Co., 960 F.2d 617, 621 (7th Cir. 1992)). "[A] plaintiff must establish that he would not have been treated adversely by his employer 'but for' the employer's motive to discriminate against him because of his age." Taylor, 69 F.3d at 779 (internal citations omitted).

If the Plaintiffs cannot prevail under the direct method of proof, they must proceed under the indirect method, using the McDonnell Douglas framework. Cerutti, 349 F.3d at 1061 (citing Adams v. Wal-Mart Stores, Inc., 324 F.3d 935, 939 (7th Cir. 2003)). In traditional employment discrimination cases, under the McDonnell Douglas framework, in order to make a *prima facie* case of employment discrimination, a plaintiff must establish that: (1) he is a member of a protected class; (2) he reasonably performed to the employer's expectations; (3) he was subject to an adverse employment action; and (4) the position remained open. See Michas v. Health Cost Controls of Illinois, Inc., 209 F.3d 687, 693 (7th Cir. 2000). However, as stated, Morrison contends that it laid off the Plaintiffs as part of a need to reduce its workforce. In the course of a

reduction-in-force (a "RIF"), the employer permanently eliminates certain positions from its workforce. See id. The Seventh Circuit has adopted variations of the traditional *prima facie* case, in order "to reflect the reality of the workplace." Id. ("Because the employer has removed a position entirely... it makes little sense to require a plaintiff to meet the fourth prong of the McDonnell Douglas test, in which the plaintiff must demonstrate that the position remained open or was filled by someone who was not a member of the protected class." Id.). There are also variations of the so-called "RIF McDonnell Douglas framework", in order to reflect the differences that occur subsequent to a RIF. For example, some employers will eliminate the duties of the discharged employees entirely, while others will have the remaining employees absorb the duties of the terminated employees.

In this case, the Parties disagree on the appropriate standard Plaintiffs must establish for a *prima facie* case. Plaintiffs believe that for a *prima facie* case, they must establish that they: (1) are in the protected class; (2) performed according to their employer's legitimate job expectations; (3) were discharged; and (4) had jobs that were absorbed, not eliminated. Paluck v. Gooding Rubber Co., 221 F.3d 1003, 1012, n.5 (7th Cir. 2000). In contrast, the Defendants believe the appropriate standard for the *prima facie* case is that Plaintiffs: (1) belong to a protected group; (2) were performing according to Morrison's legitimate expectations; (3) suffered from an adverse employment action; and (4) similarly situated employees substantially younger than Plaintiffs were treated more favorably. See Balderston v. Fairbanks Morse Engine Div. of Coltec Industries, 328 F.3d 309, 321-22 (7th Cir. 2003). Defendants contend that Plaintiffs proposed standard, which is referred to as the "mini-RIF" standard, is inapplicable to the present case because that standard is only appropriate when a single employee is discharged

and his position is not filled, but his duties are assumed by other employees. Michas 209 F.3d at 693; see also Bellaver v. Quanex Corp., 200 F.3d 485, 495 (7th Cir. 2000). However, Defendants do not dispute that Plaintiffs' duties were absorbed by the remaining Morrison employees. See Def. Local Rule 56.1(a) Statement of Material Facts, ¶ 174. Additionally, Plaintiffs have presented adequate evidence to show that their duties, were not completely eliminated, but were absorbed by other Morrison employees. It is undisputed that in December 2002, Morrison continued to make machines, Morrison accepted new machine orders in 2003, and the Plaintiffs trained other employees to assemble machines as late as December 2002. Further, in 2002, Morrison had an outside company perform some welding work, and in 2003, Morrison had an employee from an outside company perform welding work. In addition, in late 2002, Thibideau and Guhl trained Buchholz in the assembly of timing screw kits and machine, and in 2003, after Plaintiffs were terminated, Buchholz worked in the assembly of timing screw kits and stars and guides, and the Aurora machine project. Finally, it is undisputed that in 2003, employees Buchholz, Mike Saunders, Steve Smit, Armando Garza, John Kurylo and Nick Hernandez, as well as several non-production employees, assumed Plaintiffs' assembly duties. The Seventh Circuit has held that when the discharged employee's duties were absorbed by other employees, the "similarly situated" prong of the RIF test is inappropriate. Paluck, 221 F.3d at 1012, n.5. The Court in Paluck noted that, "For purposes of deciding the proper prima facie case requirements to apply, our inquiry is dependent not on the number of employees terminated, but 'on whether [the employer] still needed [the employees'] job responsibilities to be performed.' " Id. (citing Michas, 209 F.3d at 694). Therefore, because the Plaintiffs have presented adequate evidence to demonstrate that their employment duties were absorbed, rather than eliminated, to

-12-

establish a *prima facie* case, each Plaintiff must show that he : (1) is in the protected class; (2) performed according to Morrison's legitimate job expectations; (3) was discharged; and (4) had a job that was absorbed, not eliminated.

If Plaintiffs are able to establish a *prima facie* case of employment discrimination, the burden then shifts to the employer to provide a legitimate, nondiscriminatory reason for its decision to terminate the employees. Peele v. Country Mut. Ins. Co., 288 F.3d 319, 326 (7th Cir. 2002) (citing Paluck, 221 F.3d at 1009). The burden then shifts back to the Plaintiffs to present sufficient evidence "to enable a trier of fact to find that the employer's proffered reason is pretextual." Id. Ultimately, however, the burden rests with the Plaintiff to "demonstrate that the employer would not have made the adverse employment decision in question but for his membership in a protected class." Cerutti, 349 F.3d at 1061 (citing Patton v. Indianapolis Pub. Sch. Bd., 276 F.3d 334, 339 (7th Cir. 2002)).

### *B. Have the Plaintiffs Established a Prima Facie Case of Employment Discrimination?*

Steinweg, Thibideau and Guhl have presented sufficient evidence to establish a *prima facie* case, as it is undisputed that they (1) are in the protected class; (2) performed according to Morrison's legitimate expectations; (3) were discharged; and (4) had positions that were absorbed, not eliminated. However, with Mangrum, the second prong of the *prima facie* case is in dispute. Morrison contends that Mangrum's work record is checkered with numerous write-ups and notations of his deficiencies. Mangrum counters by stating that he was performing to Morrison's legitimate expectations at the time of his lay off, and that Morrison has exaggerated the nature of any performance issues Mangrum may have had during employment with Morrison.

-13-

The Court will evaluate the evidence to determine whether Mangrum was performing to Morrison's legitimate expectations.

### 1. Was Mangrum Performing to Morrison's Legitimate Expectations?

As stated, Morrison contends that Mangrum was not performing to its legitimate expectations. Therefore, the Court must determine whether, construing all facts in the light most favorable to the Plaintiff, Mangrum was performing according to Morrison's legitimate expectations prior to his layoff. Morrison contends that throughout his employment, Mangrum received documented proof of his employment performance deficiencies. Conversely, Mangrum contends that his work record contained very few performance issues, and that Morrison has exaggerated the significance of those documents in order to justify Mangrum's termination. Mangrum notes when he was laid off, he was not told that his termination had anything to do with performance deficiencies, and that it was only after he filed a charge with the EEOC that his performance became an issue.

It is undisputed that the following incidents occurred during Mangrum's employment with Morrison: (1) Tom Gora wrote a memo to Lois Hayworth noting that Mangrum noted that he checked a discharge pitch when in fact, he did not; (2) Mangrum admitted that Wilson told him he believed the numbers Mangrum had written down differed from the actual measurements of a Morrison product and appeared to be copied from a data sheet; (3) In June 1998, Lois Hayworth issued a written warning to Mangrum, because he failed to perform the mandatory function of logging in a verification with respect to inspection tools; (4) On January 22, 1999, Gora told Mangrum that Gora wanted to personally double-inspect the PDC timing screws produced by Mangrum prior to shipping; (5) On July 11, 2000 Joe Hayworth wrote up Mangrum

because Mangrum failed to write a requisite quality report earlier in the month; (6) On July 24, 2000, Gora wrote a note to Lois Hayworth (and copied Mangrum's file), documenting Mangrum's need to be more complete in filling out quality reports; (7) On July 31, 2000, Gora wrote a note to Lois Hayworth (copying Mangrum's file), regarding several parts which Mangrum had inspected and approved that were manufactured incorrectly; (8) On August 24, 2000, Gora wrote a note to Lois Hayworth (copying Mangrum's file), regarding documenting any fixtures that are used to inspect MFG parts; (9) In September 2000, Morrison documented the need for Mangrum to ask for help in inspecting products in the event he had a large volume being shipped; (10) Mangrum's November 2000 performance review states Gora's concern that Mangrum was making an increasing number of mistakes, and passing an increasing number of incomplete parts through assembly, and indicated a desire for Mangrum to improve his communication with Joe Hayworth to improve these issues; (11) In January 2001, Gora documented the need for Mangrum to inform Gora or Joe Hayworth if Mangrum was going to leave before his scheduled quit time, and that also Joe Hayworth felt that Mangrum needed to provide more updates to him; and (12) In July 2002, Gora talked with Mangrum about the importance of filling out quality reports completely.

To refute Morrison's contention that he was not performing to the company's legitimate expectations, Mangrum presents the following undisputed evidence: (1) Morrison's 2001 performance review states that Morrison "did a good job of inspecting with very few errors." (See Pl. Tab 23–Performance/Salary Reviews of James Mangrum, p. 20); (2) Mangrum completed a 3 hour college course in "Total Quality Management" in the spring of 2001, in which he received a grade of "A."; (3) Morrison received the highest possible rating under

"Dependability and Attendance" for the years 1999 through 2001; (4) Mangrum continuously received raises from Morrison; and (5) Mangrum's 2001 evaluation stated: "[Mangrum] is extremely dependable, being to work on-time. Will stay as required. For those things that must happen, you can depend on [Mangrum]." (See Pl. Tab 23–Performance/Salary Reviews of James Mangrum, p. 20.).

Undoubtedly, the evidence shows from at least 1998 until his layoff in 2002, Mangrum made mistakes during his employment with Morrison. However, for purposes of this summary judgment motion, when evaluating whether Mangrum met Morrison's legitimate expectations, the crucial time of scrutiny is that period of employment immediately prior to his termination. Peele, 288 F.3d at 329 (internal citations omitted). As noted, in his 2001 evaluation, the last formal evaluation on record prior to his lay off, Morrison stated, "[Mangrum] is extremely dependable, being to work on-time. Will stay as required. For those things that must happen, you can depend on [Mangrum]." There is only one adverse notation in Mangrum's employment file in the year prior to his layoff. In 2002, Gora talked with Mangrum about the importance of filling out quality reports completely. While this fact is noteworthy, it is not sufficient to rebut the record evidence that shows that in his last year of employment with Morrison, the company's view of Plaintiff was favorable. As such, the record before the Court indicates that prior to his lay off, Morrison had a positive view of Mangrum. Consequently, the evidence shows that at the time of his lay off, Mangrum was performing to Morrison's legitimate expectations. Therefore, all four Plaintiffs have established a *prima facie* case of age discrimination.

*C. Are Morrison's Legitimate, Non-Discriminatory Reasons Pretextual?*

Because each Plaintiff is able to establish a *prima facie* case of age discrimination, the burden now shifts to Morrison to produce a legitimate, nondiscriminatory reason for the Plaintiffs' termination. Cerutti, 349 F.3d at 1061 (citing Peele, 288 F.3d at 326). Again, Morrison states that based on its poor financial condition, it was forced to eliminate positions from its work force, and after evaluating the skills set of each employee, it determined that Plaintiffs should be included in the RIF. Now that Morrison has offered a legitimate, nondiscriminatory reason for why it had to lay off the Plaintiffs, the burden now shifts to the Plaintiffs to "rebut that explanation by presenting evidence sufficient to enable a trier of fact to find that the employee's proffered reason is pretextual [i.e., a lie]." Cerutti, 349 F.3d at 1061 (quoting Peele, 288 F.3d at 326). In the traditional employment discrimination case, to show pretext, a plaintiff must show that the employer's articulated reason for the adverse employment decision: (1) had no basis in fact; (2) did not actually motivate its decision; or (3) was insufficient to motivate its decision. Grayson v. O'Neill, 308 F.3d 808, 820 (7th Cir. 2002) (citing Velasco v. Illinois Department of Human Services, 246 F.3d 1010, 1017 (7th Cir. 2001)). However, in a RIF case, the pretext standard is altered slightly. The Plaintiff need not prove that the reason proffered by the employer is a lie. Testerman v. EDS Technical Products Corporation, 98 F.3d 297, 303 (7th Cir. 1996) (citing Russell v. Acme-Evans Co., 51 F.3d 64, 68 (7th Cir. 1995)); see also Adreani v. First Colonial Bankshores Corp., 154 F.3d 389, 395 (7th Cir. 1998). Rather, the Plaintiff must establish that "age 'tipped the balance' in favor of discharge." Testerman, 98 F.3d at 304 (quoting Umpleby v. Potter & Brumfield, Inc., 69 F.3d 209, 213 (7th Cir. 1995)). Consequently, if "age enters into the calculus to such an extent that the employer

fires an employee who otherwise would have survived the RIF, the ADEA has been violated."

Testerman v. EDS Technical Products Corporation, 98 F.3d 297 at 304. Plaintiffs have stated

that both Morrison's contention that it was in poor financial health, and its assertions that other

employees were more qualified to survive the RIF (assuming, *arguendo*, that the RIF was bona

fide) , are pretextual. Therefore, the Court will first analyze whether the Plaintiffs have raised a

genuine issue of material fact concerning the legitimacy of Morrison's need to reduce its

workforce, and secondly, whether Plaintiffs have raised a genuine issue of material fact regarding

Morrison's contention that other employees were more qualified than the Plaintiffs to survive a

bona fide RIF.

### 1. Plaintiffs' Proffered Evidence Concerning Legitimacy of RIF

As previously stated, Morrison contends that in December 2002, the company's financial

health was poor.  Morrison maintains that between fiscal year 2001 (April 1, 2001 through March

31, 2002), and fiscal year 2002 (April 1, 2002 through March 31, 2003), its net income decreased

drastically.  Plaintiffs refute Morrison's contention that it was in poor financial health by offering

the following evidence: (1) Numerous production employees received a pay increase at the time

of his or her 2002 and 2003 reviews; (2) 2003 annual wages of numerous production employees

increased significantly over their 2002 wages; (3) In the last six months of 2002, Morrison hired

four new full time employees to work in the production department; (4) Morrison hired five  new

employees in 2003, including three new engineers; (5) Morrison made significant purchases of

new equipment in 2002; (6) Morrison continued to make contributions to the company's

401K/profit sharing plan, despite the fact that those contributions were entirely discretionary; (7)

The overtime hours available for production employees increased significantly in 2003; (8)

Plaintiffs' overtime hours in 2002 increased significantly compared to overtime hours worked in 2001; (9) From 2001 to 2002, overall sales increased; (10) Between fiscal year 2001, and fiscal year 2002, machine sales increased; and (1) Machine sales orders between the end of fiscal year 2002 (March 31, 2003) and December 2003 were significant.

By refuting Defendant's assertions of its financial state at the time of Plaintiffs' layoff in December 2002, Plaintiffs are requesting that the Court determine that there is a genuine issue of material fact concerning whether Defendant needed to lay off *any* employees, regardless of age, and that the stated RIF was merely a ruse for unlawful age discrimination. Paluck, 221 F.3d at 1012 (citing Matthews v. Commonwealth Edison Co., 128 F.3d 1194, 1197 (7th Cir. 1997). Therefore, under Plaintiffs' analysis of Defendant's financial condition, age could have never "tipped the balance" in favor of discharge, because, but for unlawful employment discrimination, no one would have been fired. Therefore, Plaintiffs' contention of Defendant's financial state must be analyzed under the traditional pretext analysis, and Plaintiffs must be able to show that Morrison's articulated reason of poor financial condition: (1) had no basis in fact; (2) did not actually motivate its decision; or (3) was insufficient to motivate its decision. Grayson, 308 F.3d at 820 (internal citations omitted). "[I]n determining whether an employer's proffered reason for an employment action was pretextual, we are not concerned with the correctness or desirability of reasons afforded for employment decisions, but rather the issue of whether the employer honestly believes in the reason it offers." Grayson, 308 F.3d at 820 (citing Wade v. Lerner New York, Inc., 243 F.3d 319, 323 (7th Cir. 2001)). Based on the evidence before the Court, Plaintiffs have raised a genuine issue of material fact as to whether Defendant's RIF was merely a ruse, and an excuse to get rid of older workers. On their face, many of the

actions that Defendant took immediately following the RIF seem counterintuitive in the face of

heavy financial losses, including the fact that Defendant: (1) gave many production employees

raises in 2002 and 2003; (2) hired four new full time employees in the last six months of 2002;

(3) hired five new employees in 2003; (4) made significant purchases of new equipment in 2002;

and (5) continued to increase employees' overtime hours.

In an attempt to refute Plaintiffs' contention that the RIF was pretext for age

discrimination, Morrison explains its rationale for some of the financial decisions it made

subsequent to the RIF. Morrison states that though it produced custom machines in 2003, its

decision to produce any given machine was based on individual business decisions relating to

each machine (i.e., three machines had been built before and therefore incurred no design costs

and were more profitable, and one machine was for a large change part customer for whom

Morrison determined it should produce the machine for customer relation purposes). Further,

Defendant contends, it was  more cost efficient to pay overtime to the employees who remained

after the layoffs, rather than pay the salaries, health insurance and other benefit costs of the four

Plaintiffs. Notwithstanding Morrison's proffered reasons for its need for a RIF, Plaintiffs have

presented sufficient evidence to raise a genuine issue of material fact as to whether Morrison's

RIF was pretextual.

### 2. In the Face of a Bona Fide RIF, Were Defendant's Proffered Reasons for Choosing Plaintiffs Pretextual?

The second part of the analysis of Defendant's employment decisions requires the Court

to determine whether, in the face of a bona fide RIF, Plaintiffs can, "show pretext by

demonstrating that the specific reasons given for including [Plaintiffs] in the reduction were

pretextual." Paluck, 221 F.3d at 1013 (internal citations omitted). Therefore, in order to analyze the reasons given for choosing Plaintiffs, the Court will assume, *arguendo,* that Defendants' RIF was bona fide. In this regard, Plaintiffs provide evidence that attempts to cast doubt on the Defendants' contention that, because of their experiences, the retained employees gave Morrison a better chance of recovering from its financial problems that the four Plaintiffs did. In order to determine whether Plaintiffs have raised a genuine issue of material fact concerning whether Defendant's stated reasons for not retaining the Plaintiffs are pretextual, for each Plaintiff, the Court will address: (1) Defendant's stated reasons for laying off that Plaintiff; (2) Defendant's proffered reasons for retaining the younger employee(s); (3) Plaintiff's evidence that seeks to cast doubt on the Defendant's reasons; and (4) whether that Plaintiff has raised a genuine issue of material fact concerning whether Defendant's retention decision is pretextual.

### a. James Mangrum

Again, Morrison contends that it selected Mangrum for layoff because the quality of his work was low, and it determined that it did not need two employees to perform inspection work. Additionally, Morrison contends, in selecting Mangrum of layoff, Wilson considered the fact that Mangrum was not dependable, and would sometimes allow inferior parts to pass inspection. Additionally, Morrison states that it considered that Mangrum was not growing in certain areas, and that it took a long period of time for Mangrum to enroll in an educational class that could further his growth in the company. Finally, Morrison considered the communication problems Mangrum had with Joe Hayworth and others.

Mangrum contends that Malcolm Russell ("Russell"), age 46, was his replacement, as he contends that he trained Russell for several years prior to Mangrum's layoff. Morrison contends

that it ultimately chose to retain Russell over Mangrum for the inspection position because: (1) Wilson was familiar with Russell's performance; (2) Russell did not have performance issues like Mangrum; and (3) Russell had more experience than Mangrum insofar as Russell had more stockroom experience than Mangrum, and Mangrum never worked in the shipping department.

Mangrum refutes Morrison's proffered reasons by stating that Morrison's lack of significant experience played no role in Morrison's decision to terminate him, because Defendants hired Ali Elomar ("Elomar"), age 20, into the stockroom shipping department, who immediately began to work full-time and overtime in the stockroom through December 2002. Therefore, Mangrum contends, there was never going to be a position in the stockroom for him, because by the time Mangrum was laid off, Russell's stockroom position had been filled by Elomar. Mangrum also notes that Russell had disciplinary problems as well. In 1995, Russell received a disciplinary warning in 1995, for failure to follow instructions to train other employees. Morrison has also criticized Russell for seeming uncooperative, maintaining a disorganized stockroom, and wasting company resources by spending time away from his work area while talking to office personnel. Finally, Mangrum notes that although Wilson was familiar with Mangrum's work and had worked with him for years, Wilson did not review any personnel files when making his decision to discharge the Plaintiffs.

As noted, in the context of a RIF, the Court need not find that Mangrum's proffered reasons for retaining Russell over Mangrum were a lie, or not worthy of credence or belief. To survive summary judgment, Mangrum need only show that there is a genuine issue of material fact concerning whether age "'tipped the balance'" in favor of his discharge. As an initial matter, the Court notes that although Russell, at 46, is over 40 and part of the protected class pursuant to

-22-

the ADEA, Mangrum can still bring a claim against him, as Russell is "substantially younger" than Mangrum. See Hartley v. Wisconsin Bell, Inc., 124 F.3d 887, 893 (7th Cir. 1998) ("[W]e consider a ten-year difference in ages (between the plaintiff and her replacement) to be presumptively 'substantial.' " Id.) Of course, when evaluating Morrison's decision in the face of a bona fide RIF, the Court notes that Defendant was free to use varied criteria to enable it to retain the workers that would best serve the needs of the company in the face of financial difficulty. In addition, "the federal anti-discrimination laws do not authorize judges to sit as a kind of 'super-personnel department' weighing the prudence of employment decisions." Grayson, 308 F.3d at 820 (citing Gleason v. Mesirow Financial, Inc., 118 F.3d 1134, 1139 (7th Cir. 1997)). Particularly, in the context of an RIF, the Court recognizes that the employer must often make tough decisions in the face of inevitable layoffs, and the Court does not want to engage in an unfair scrutiny of that process. However, it is also the Court's role to ensure that when Morrison made those difficult personnel decisions, age did not "tip the balance" in favor of discharging older employees. Plaintiff has presented sufficient evidence to raise a genuine issue of material fact as to whether, in the context of a bona fide RIF, Defendant's reason for retaining Russell over Mangrum were pretextual. If Russell did not have any disciplinary issue while employed with Mangrum, then the Court might reach a different result about the sufficiency of Mangrum's evidence. However, because it is undisputed that both Mangrum and Russell had disciplinary issues, there remains a genuine issue of material fact concerning whether Morrison's stated reasons for retaining Russell over Mangrum were pretextual.

### b. Paul Steinweg

Morrison contends that it specifically selected Paul Steinweg, age 64, for layoff because there was a lack of welding work. Additionally, Morrison contends that Steinweg lacked the necessary skills to transfer to other Morrison departments. In particular, Morrison contends, Steinweg did not possess the necessary skills to operate the computer-controlled equipment used to make timing screws, timing screw kits and change parts.

Steinweg contends that Robert Buchner, age 47, (once Buchner returned to Morrison in early 2003), absorbed his duties. Buchner's first hire date at Morrison was July 8, 2002, as an hourly engineer.[7] This was the first time that Steinweg trained any other engineer to do welding. Additionally, to refute Morrison's contention that a lack of welding led to Morrison's decision to discharge him, Steinweg notes that Buchner's 2003 performance evaluation states that Buchner was "VERY helpful in moving into other areas when needed–welding, assembly, stockroom, etc." (See Def. Tab 35–Performance/Salary Reviews of Robert Buchner at p. 1749). In addition, in 2002 and 2003, an outside company performed at least two welding jobs for Morrison. Finally, to refute Morrison's contention that Steinweg did not possess the necessary skills to operate the equipment used to make timing screws, timing screw kits and change parts, Steinweg notes that in addition to welding, he assembled machines, timing screw kits, timing screws, and stars and guides, did some wiring of machines, and did building maintenance, and he can also

---

[7] Although Buchner was hired as an hourly employee into an engineering position, it should be noted that engineers at Morrison are salaried employees, not hourly. When Buchner returned to Morrrison after his three-week layoff, he returned as an hourly employee. Buchner eventually became a salaried employee, as of the next paycheck issued after June 11, 2003. Notably, on June 11, 2003, Defendants were served with Plaintiffs' Complaint in this case.

operate Morrison's manual mills and lathes. Finally, Steinweg notes that in the past, he made service calls to customers when needed.

Steinweg has raised a genuine issue of material fact as to whether, in the face of a bona fide RIF, Morrison's stated reasons for discharging Steinweg were pretextual. Particularly significant to the Court's analysis is that in 2003, Morrison rehired Buchner (who, although in the protected class, is "substantially younger" than Steinweg), and when he returned, he did welding work for Morrison. Additionally, Buchner trained Steinweg for that welding work in 2002, less than six months before Morrison's December 2002 layoffs. As such, it remains that there is a genuine issue of material fact whether age unlawfully "tipped the balance" in favor of Steinweg's discharge.

### b. Frank Thibideau and James Guhl[8]

Morrison contends that it specifically selected Frank Thibideau, age 59, for layoff because there was a lack of machine assembly work. Morrison also contends that Thibideau lacked the necessary skills to move into other areas of the company. In particular, Morrison maintains that Thibideau lacked computer-controlled equipment operating skills and the experience in making and assembling timing screws that other people had. To refute Morrison's assertions, Thibideau notes that Morrison did allow him to operate its manual machines, and notes his years of experience and ability to work in a variety of areas of the company, including working in the assembly of machines, timing screw kits and stars and guides/change parts, the

---

[8] Because Thibideau and Guhl contend that they trained several of the same individuals who ultimately became their replacements, the analysis of their pretext claim will be addressed simultaneously.

operation of manual mills and lathes, and other shop equipment. Finally, Thibideau notes that he has designed certain prototype machines for Morrison.

Morrison contends that it specifically selected James Guhl, age 57, for layoff, because of the lack of machine assembly work. Morrison also contends that it selected Guhl for layoff because he lacked the skills sets that other employees who were already doing certain jobs, or capable of doing those jobs, possessed. In particular, Morrison notes, although Guhl was a Komo operator, he was third in line to perform that position. Finally, Morrison contends that Guhl lacked the requisite skills set in the area of timing screws. As with Thibideau, Guhl notes his extensive employment history with Morrison, and his ability to work as a welder and change part assembler (including timing screws and stars and guides). In addition, Guhl has performed shop maintenance, and can also operate a mill and lathe. Guhl notes that John Kurylo, age 48, who worked in change parts when Guhl was discharged, had been working in change parts for only about one and a half years. Further, Guhl has known how to operate a Komo machine for at least eight years, and operated the Komo for three to four years before Robert Panozzo, age 28, was hired in 1998.

Thibideau and Guhl contend that they trained Marc Buchholz, age 36 ("Buchholz") to (unbeknownst to them) assume their duties. In late 2002, Thibideau and Guhl trained Buchholz in the assembly of timing screw kits and machines. Consequently, in 2003, after Plaintiffs were laid off, Buchholz worked in the assembly of timing screw kits and stars and guides, and the Aurora machine project. Additionally, Steve Smit, age 46 ("Smit"), along with Buchholz, also worked on new machine orders in 2003. Additionally, in 2003, any maintenance work done by Plaintiffs was absorbed by Bob Jabaay, age 48. Again, Defendants contend that even assuming

-26-

that younger, less experienced employees have replaced these two Plaintiffs (which Defendant contends is an incorrect assumption), again, Morrison felt that the remaining employees had the requisite skills sets to allow Morrison to return to an optimal financial state, which had nothing to do with the age of any particular employee. After reviewing all evidence in the light most favorable to the Plaintiffs, both Thibideau and Guhl have presented sufficient evidence to raise a genuine issue of material fact concerning whether Defendant's stated reasons for deciding to lay off Thibideau and Guhl are pretextual. As with the other Plaintiffs, it is notable that all of the employees who absorbed Thibideau and Guhl's duties were substantially younger.[9] Consequently, Thibideau and Guhl can proceed to trial, in order to allow a trier of fact to determine whether age "tipped the balance" in favor of their discharge.

### D. Additional Arguments Presented by Morrison to Rebut Any Inference of Discrimination

Finally, Morrison cites two other factors that it feels should rebut any inference of discrimination. First, Morrison notes that it did retain employees 40 and over subsequent to its layoff of Plaintiffs: (1) Tom Chismar, 48; (2) Robert Jabaay, 48; (3) Dorothy Kuipers, 41;(4) Lee Kuipers, 47; (5) John Kurylo, 48; (6) Ubalo Otero, 43 ; (7) Michael Rich, 55; (8) Malcolm

---

[9] The Court notes that at age 48, employees Kurylo and Jabaay are not ten years younger than Guhl, age 58 (with a birthday of February 27, 1945, Guhl is 9 years and 7 months older than Kurylo (whose birthday is September 27, 1954), and 9 years and 10 months older than Jabaay (whose birthday is December 17, 1954). However, the Seventh Circuit has stated, "Ten years is a reasonable threshold, establishing a 'reasonable' and 'significant' gap...yet the line we draw is not so bright as to exclude cases where the gap is smaller but evidence nevertheless reveals the employer's decision to be motivated by the plaintiff's age." Hartley, 124 F.3d at 893. In this case, because Kurylo and Jabaay are very close to being ten years younger than Guhl, and Plaintiffs have presented sufficient evidence to show that age may have been a significant factor in Morrison's discharge decisions, Kurylo and Jabaay will be deemed "substantially younger" than Guhl.

Russell, 46; (9) Mike Saunders, 46; (10) Steve Smit, 46; and (11) William Tatum, 51.

Defendants note that certain cases have held that there is no inference of discrimination where, even though all employees discharged in the RIF were over 40 years old, the employer retained several employees who were over 40 years old. See Jackson v. E.J. Brach Corp., 176 F.3d 971, 985-86 (7th Cir. 1999). While the Court in Jackson did determine that the fact that employees within the protected group remained employed with the corporation was a factor in rebutting any inference of discrimination, several of the factual circumstance of that case are distinguishable from the Plaintiffs' case. First, in Jackson, the employee who replaced the Plaintiff was older than him. Id. In this case, all of the employees who absorbed the Plaintiffs' duties were substantially younger. Second, in Jackson, the Defendants terminated all of the salaried employees of a particular group, and it just so happened that all salaried employees were over 40. Id. In this case, there is no similar thread in Plaintiffs' former employment positions at Morrison that would rebut Plaintiffs' evidence demonstrating pretext. It should also be noted that although there were other employees who were over 40 remaining at Morrison, Plaintiffs were the four oldest working employees. [10] Therefore, because of the distinctive facts of this case, the fact that older employees remained at Morrison does not preclude Plaintiffs from proceeding to trial.

Secondly, Defendants note that Nick Wilson, President and ultimate decision maker at Morrison, was 58 years old when he decided to lay off the Plaintiffs. Defendant notes that in Jackson, the Court found that the fact that the decision maker was older than the plaintiff was

---

[10] Although Morrison has listed John Williams as an employee, Williams became ill in May 2002 and never returned to work. Consequently, John Williams was not performing any work duties at Morrison at December 2002, and will not be considered a "working" employee for purposes of this summary judgment motion.

-28-

significant in evaluating the discrimination claims. Id, at 984, n.2. (citing Mills v. First Federal Sav. & Loan Ass'n of Belvidere, 83 F.3d 833, 842 (7th Cir. 1996)). While this factor is noteworthy, it is not dispositive, and again, Plaintiffs have presented sufficient evidence to defeat summary judgment. Further, the Court in Mills noted that, "Persons of *any* age are capable of practicing age discrimination." Mills, 83 F.3d at 842 (emphasis in original). Therefore, the fact that the decision maker was older than two of the Plaintiffs will not prevent them from going to trial. Consequently, because all four Plaintiffs have raised genuine issues of material fact concerning whether Morrison's stated reasons for their lay offs are pretextual, they may proceed to trial.

## IV. CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment is DENIED.

Enter:

_____
David H. Coar
United States District Judge

Dated: **August 2, 2004**